## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 06-22347-CIV-HUCK/SIMONTON
### CASE NO.: 06-22539-CIV-HUCK/SIMONTON

REGENT SEVEN SEAS CRUISES, INC.,

        Plaintiff,

vs.

ROLLS ROYCE, PLC, et al.,

        Defendants.

_____/

ALSTOM POWER CONVERSION, et al.,

        Petitioners,

vs.

RADISSON SEVEN SEAS (FRANCE) S.N.C., et al.,

        Respondents.

_____/

## ORDER DISMISSING PETITION TO COMPEL ARBITRATION

THESE CONSOLIDATED MATTERS are before the Court upon several related motions. On October 13, 2006, Rolls Royce, PLC, *et al.*, (hereinafter "Rolls Royce) and Alstom Power Conversion, *et al.*, (hereinafter "Alstom" and together with Rolls Royce, "Petitioners") filed a Joint Motion to Stay, or in the Alternative, Dismiss the Action ("Joint Motion to Stay") [D.E. #6]. On November 22, 2006, Regent Seven Seas Cruises, Inc. ("Regent") and Radisson Seven Seas (France) S.N.C. ("Radisson" and together with Regent, "Respondents") filed a Motion to Dismiss Petition to Compel Arbitration [D.E. ##29, 31]. At this point, the sole issue before the Court is

whether the Petitioners may compel Regent to arbitrate its claims pursuant to an arbitration clause contained in a shipbuilding contract between Radisson and Chantiers de l'Atlantique ("CAT").

## I.      Procedural Background

On or about August 9, 2006, Plaintiff, Regent, filed a complaint in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida against various Rolls Royce and Alstom entities.   On September 18, 2006, Rolls Royce filed a Notice of Removal of the action before this Court.   Case No. 06-22347-CIV, [D.E. #1] ("Removed Action").   In essence, the complaint alleged that Rolls Royce and Alstom "defrauded and deceived Regent . . . into the purchase and continued use of a propulsion system for the [luxury cruise vessel,] m/v Seven Seas Mariner (the "Mariner")."  Compl. ¶ 17.

On October 13, 2006, Petitioners initiated a separate action in this Court before Judge Graham with a Petition to Compel Arbitration against Regent and Radisson.  Case No. 06-22539 [D.E. #1] ("Petition Action").   This action asserted rights under the Convention on the Recognition of Foreign Arbitral Awards, codified at 9 U.S.C. §§ 201-208. The Petitioners essentially asserted that any claims that Regent or Radisson may have against the Petitioners must be arbitrated pursuant to an arbitration clause contained in the Mariner's shipbuilding contract between Radisson and CAT.  After receiving notice from the parties that the cases dealt with the same subject-matter, the Petition Action was transferred by Judge Graham on October 19, 2006.  The Court then ordered on October 29, 2006 that the two cases be administratively consolidated, with Case No. 06-22347 serving as the Master Case.

Also on October 13, 2006, in the Removed Action, Rolls Royce and Alstom filed a Joint Motion to Stay, or in the Alternative, Dismiss the Action ("Joint Motion to Stay") [D.E. #6].  This

motion also asserted that Regent's claims must be arbitrated pursuant to the terms of the Mariner's shipbuilding contract. On November 22, 2006, both Regent and Radisson filed a Motion to Dismiss Petition to Compel Arbitration [D.E. ##29, 31]. In addition, Regent filed its Memorandum in Opposition to the Joint Motion to Stay [D.E. #30].

On that same day, Regent filed an Amended Complaint [D.E. #32] against Rolls Royce and Alstom, both individually and as joint venturers in the production of the Mermaid pod propulsion system. In the Amended Complaint, Regent accuses the Petitioners of fraud in the inducement (Count I), breach of express warranty (Count II), breach of warranty of workmanlike performance/negligent warning (Counts III-IV, VI), negligent misrepresentation (Count V), deceptive and unfair trade practices (Count VII) and a civil conspiracy to defraud (Count VIII). Rolls Royce and Alstom indicated that the filing of the Amended Complaint did not alter the substance of their motions to compel arbitration and dismiss the case. The Court held a hearing on the arbitration issue. As noted above, the lone issue before the Court is whether Regent's claims against Rolls Royce and Alstom must be arbitrated pursuant to the arbitration clause in the shipbuilding contract.

## II.    Factual Background

### A.    The Parties

Radisson is a French business entity with its principal place of business in France. Radisson is the owner of the cruise vessel Mariner. Radisson assumed ownership of the Mariner in the shipbuilding contract with CAT.[1] The parties do not dispute that Radisson, as a signatory to the

---

[1] In fact, due to a financial arrangement, CAT initialed delivered the Mariner via a bareboat charter to a separate entity which then delivered it to Radisson, but the mechanics of those transactions are unimportant at this stage.

shipbuilding contract, may be bound by the terms of the arbitration clause.  Radisson has not,

however, brought any claims before the Court and insists that it does not have any claims against

Petitioners at this time.[2]  Because Radisson has asserted no claims in this or any other related

litigation, it will not be considered subject to arbitration in this matter.

Regent is a Minnesota corporation with its principal place of business in Ft. Lauderdale,

Florida.  It is a luxury cruise line which charters and operates luxury cruise vessels, including the

Mariner.

The Rolls Royce and Alstom entities[3] are corporations that entered into a joint venture, the

Mermaid Consortium, for the "design, development, manufacture, sales, marketing, service and

repair of an innovative system for the propulsion of seagoing vessels which it marketed and sold

under the name 'Mermaid™.'" Amend. Compl. ¶ 13.  According to the Amended Complaint, the

Mermaid Consortium engaged in business activity intended to induce Regent to use the Mermaid

pod propulsion system.  *Id.* ¶ 14.

CAT, a non-party to this action, is a French shipyard company that constructed the Mariner.

Although the specific relationship is not detailed, in Petitioner's memoranda CAT is referred to as

"an ALSTOM affiliate."  *See* Mem. of the Alstom and Rolls-Royce Pet'rs in Opp. to the Mots. To

---

[2] At oral argument, Radisson stated that it was Regent's right alone to assert all claims for its losses relating to the Mariner.  Counsel for Radisson implied that Radisson, as distinct from Regent, had no claims because no injuries would exist until the time charter agreement lapsed. The Court need not and, therefore, does not express an opinion on that issue at this time.

[3] In the Amended Complaint, Regent specifically sued Rolls Royce Group, PLC f/k/a Rolls Royce, PLC, Rolls Royce Power Engineering, PLC, and Rolls Royce AB, f/k/a Kamewa AB, Alstom Holdings S.A. f/k/a Alstom S.A., Alstom Power conversion, S.A. f/k/a Cegelac, Converteam S.A.S. f/k/a Alstom Power Conversion S.A.S., Rolls Royce AB and Alstom Power Conversion S.A., and Converteam S.A.S., jointly and severally doing business as the Mermaid Consortium.

Dismiss Pet. to Compel Abitration at 2.

**B.    Factual History**

In 1997, Regent decided to build or acquire the use of a new luxury cruise vessel and began to meet with the Petitioners to discuss specifications for said ship.  On October 31, 1997, Regent signed a letter of intent with CAT for the construction of a luxury cruise ship with a conventional propulsion system.  Although the nature of the relationship between Regent and the Mariner was not specified at the time of the signing of the letter of intent, it was intended that Regent would be the operator of the Mariner.  Because of financing and tax reasons, Regent determined that "the financial vehicle best suited for Regent was a comprehensive long-term charter agreement."  *Id.* ¶ 26.  Regent further states that the Petitioners were at all times fully aware of the nature of Regent's relationship to the vessel to be built.

That original letter of intent called for the vessel to be constructed with a conventional diesel-electric propulsion system.  According to Regent, however, once the Petitioners learned that a letter of intent had been signed, they "engaged in a spectacular 'marketing' assault intended to convince Regent, which was going to time charter the vessel, to specify and ultimately require that the [disponent] owner of the vessel would construct the vessel with the Mermaid Pod System instead of its original conventional propulsion system."[4]  Amend. Compl. ¶ 22.  Regent alleges that in those overtures (and in representations to Regent's technical advisor, Baker Ship Management) the Petitioners grossly misrepresented critical facts regarding the suitability and reliability of the Mermaid Pod System for a large cruise vessel.

---

[4] "A pod propulsion system is an integrated unit that combines a propeller shaft and motor in a streamlined, self-contained unit known as a 'pod,' that is attached beneath the ship."  Amend. Compl. ¶ 30.

Notwithstanding the letter of intent, on December 21, 1998, in accordance with Regent's subsequent decision to charter from Radisson rather than own the Mariner, CAT and Radisson entered into a written shipbuilding contract for the construction of the Mariner. The contract detailed the instructions for the construction of the ship, including specifications for the pod propulsion system, ship speed requirements and warranty and remedy requirements. Importantly, that shipbuilding contract contained an arbitration clause, which states, "[i]n the event of any dispute, difference or claim arising out of, or relating to or in connection with this Contract, the same shall be submitted to and settled by arbitration . . ."[5] Pet. to Compel Arbitration, Ex. B at 27 (Article XIV, Section 1.1). Neither the Petitioners nor Regent are signatories to the shipbuilding contract.

Also on December 21, 1998, Regent executed a long-term time charter commitment with Radisson. The ten-year agreement, referred to by Regent as a "hell or high water" contract, required Regent to pay an annual charter fee in excess of twenty million per year.

Regent obtained possession of the Mariner in March 2001, but allegedly began to experience problems with the Mermaid Pod System, leading to the ship's drydock in May 2002.

**III. Discussion**

    **A.    Subject Matter Jurisdiction**

        **1.    Subject Matter Jurisdiction Under the FAA**

Petitioners ask the Court to dismiss Regent's claims in the Removed Action and compel arbitration, pursuant to Chapters I and II of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16

---

[5] The remainder of Article XIV of the shipbuilding contract goes on to specify in greater detail the terms under which arbitration should proceed.

& 208.  Regent and Radisson assert that the Court does not have subject matter jurisdiction over the Petition Action because there is no agreement to arbitrate in writing between Petitioners and Respondents, as required by the FAA.  In response, Petitioners assert that the arbitration clause in the shipbuilding contract for the Mariner satisfies the FAA's jurisdictional requirements.

In the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), the signatories agreed to enforce written agreements to submit disputes to arbitration.  *See* 9 U.S.C. §§ 201-208.  The FAA implements the Convention by providing that it "shall be enforced in the United States courts in accordance with this chapter."  9 U.S.C. § 201.  Moreover, the FAA states that an arbitration agreement arising out of a legal relationship "which is considered commercial . . . falls under the Convention."  9 U.S.C. § 202.  Further, "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." § 203.

There are four jurisdictional prerequisites for a case to fall under the Convention: "(1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states." *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 n. 7 (11th Cir. 2005).

Here, Respondents challenge the Court's subject-matter jurisdiction because there is no such written agreement between Respondents and Petitioners.  The Second Circuit dealt with precisely this question in *Sarhank v. Oracle Corp.*  404 F.3d 657 (2d Cir. 2005); *see also Beiser v. Weysler*,

284 F.3d 665, 670 (5th Cir. 2002). There, the respondent argued that the court was deprived of subject matter jurisdiction because of the absence of a signed written arbitration agreement between the parties. The court recognized that this claim was inextricably intertwined with the merits of the case. *Sarhank*, 404 F.3d at 660 (noting "that argument depends entirely upon respondent's view of the merits of the case"). In essence, the court in *Sarhank* recognized that once it has been asserted that a written agreement exists (even if it is not between the parties in the litigation), the jurisdictional element has been satisfied. *Id.* at 660. The presence of a proper written agreement is more properly viewed as an element of the claim rather than a jurisdictional prerequisite. *Id.*

The Eleventh Circuit has reached a similar result in an arbitration dispute arising out of 9 U.S.C. § 205.[6] *Bautista*, 396 F.3d at 1301. The court stated that "Section 205 does not require a district court to review the putative arbitration agreement--or investigate the validity of the signatures thereon-- before assuming jurisdiction: 'The language of § 205 strongly suggests that Congress intended that district courts continue to be able to assess their jurisdiction from the pleadings alone.'" *Id.* (quoting *Beiser*, 284 F.3d at 671). Based on that language, it is likely that the Eleventh Circuit would endorse the Second Circuit's view in *Sarhank* that questions over the existence or validity of the requisite written arbitration agreement go to the merits and do not implicate jurisdictional concerns.

In this case, Petitioners assert that the written shipbuilding contract between CAT and Radisson compels arbitration between Regent and Petitioners (even though none is a signatory to the contract.) Although Regent vigorously denies that the arbitration clause is applicable to it in

---

[6] 9 U.S.C. § 205 grants defendants the right to remove a case from state court when the subject matter relates to an arbitration agreement falling under the Convention.

this case, it does not deny that it is a valid arbitration agreement.  By alleging that the written arbitration agreement applies to Regent, the Petitioners have met the jurisdictional requirement of § 202.  That is, for the Court to entertain Regent's argument that the written agreement is insufficient to compel arbitration, the Court must necessarily assume jurisdiction over the case. Regent cites several cases that reach a contrary result.  Respondents heavily rely upon *Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286 (11th Cir. 2004).  There, the Eleventh Circuit found that it did not have subject matter jurisdiction under the FAA because there was no arbitration agreement in writing between the parties.  Importantly, in *Czarina* there was no underlying written agreement at all.[7]  *Id.* at 1290.  Even then, in *Czarina*, the district court "conducted a three-day bench trial on the issue of whether [the parties] had agreed to arbitrate, a question the court held was dispositive of its own jurisdiction."  *Id.*  This is precisely the situation that the *Sarhank* court recognized: if the petitioner has properly alleged that an underlying written agreement exists and binds the parties, a court can only determine whether that agreement is valid and binding by undertaking jurisdiction to do so.

Respondents further rely on *Kahn Lucas Lancaster, Inc. v. Lark Intern. Ltd.*, 186 F.3d 210 (2nd Cir. 1999), for the proposition that a court may not assert subject matter jurisdiction over a case where there is no arbitration agreement between the parties.  *Kahn Lucas* was abrogated by *Sarhank*, however, where the court stated, "to the extent that *Kahn Lucas* is read as viewing an element of a claim as a jurisdictional requisite, the absence of which deprive the Court of subject matter jurisdiction, it is contrary to the prior holdings of [the Second Circuit]."  404 F.3d at 660,

---

[7] Czarina contended that it had satisfied the requirement by presenting an unsigned "Sample Wording" that included arbitration language, but the court rejected this argument.  358 F.3d at 1290.

n. 2.

Finally, Respondents cite to Judge Lenard's Omnibus Order in *Rolls-Royce PLC v. Royal Caribbean Cruises, Ltd.*, No. 03-23214, Slip op. (S.D. Fla. July 7, 2005). As in *Czarina* and *Kahn Lucas*, the Court found that it did not have subject matter jurisdiction because there was no underlying arbitration agreement between the parties to the litigation. Judge Lenard relied heavily on the Eleventh Circuit's *Czarina* decision (which, in turn, relied heavily upon *Kahn Lucas*). Likewise, Judge Lenard drew on the language of the Convention, which she read to restrict subject matter jurisdiction to those instances where the parties themselves had entered into a written agreement. Judge Lenard acknowledged "the decisions of Circuit Courts that have interpreted the FAA statutory provisions as conferring jurisdiction to claims relating to an arbitration clause in an agreement to which one or more of the parties is not a signatory. . . . Although the Court has reviewed these opinions, this Court is bound by Eleventh Circuit jurisprudence." *Royal Caribbean Cruises, Ltd.* at 16, n. 10 (recognizing *Beiser*, *Sarhank*, and *Sphere Drake Ins. PLC v. Marine Towing, Inc.*, 16 F.3d 666 (5th Cir. 1994)). While Judge Lenard faithfully applied the Convention, the Court finds Judge Lenard's opinion inapplicable in these circumstances. First, as noted above, *Czarina* involved *no* written agreement as opposed to a valid, signed written agreement that was simply not between the litigants, and is therefore distinguishable from the present case. Second, in light of the Eleventh Circuit's decision in *Bautista* and *Sarhank*'s abrogation of *Kahn Lucas*, it appears to be more reasonable to believe that the Eleventh Circuit would endorse a broader view of its subject matter jurisdiction under the FAA at this time.

Moreover, the Court is persuaded by the clear logic that in order to determine whether litigants are bound by an admittedly existing arbitration agreement, a court must first assume

jurisdiction to do so.  This of course does not speak to the strength of Petitioner's argument that the arbitration clause is binding upon the parties in this case, but merely recognizes the power of the Court to decide the issue.  Accordingly, the Court finds that it has subject-matter jurisdiction over this case because all of the jurisdictional prerequisites have been met.

**2.      Diversity Subject Matter Jurisdiction**

In addition, the Court has (without objection) assumed diversity subject-matter jurisdiction over the Removed Action.  As stated above, Regent is a Minnesota corporation with its principal place of business in Florida.  None of the Rolls Royce or the Alstom entities is incorporated in or maintains a principal place of business in either Florida or Minnesota.  In addition, Regent seeks damages in the order of millions of dollars.  Because there is complete diversity between the parties and the amount in controversy exceeds $75,000, the Removed Action is properly before the Court. 28 U.S.C. § 1332.

**B.      Choice of Law**

As a threshold matter, the Court must determine whether English law or U.S. federal law governs the question of whether arbitration should be compelled in this matter.  Although the shipbuilding contract provides that English law should govern the substantive interpretation of the agreement, "[f]ederal law establishes the enforceability of arbitration agreements." *Employers of Wassau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001) (citing *Perry v. Thomas*, 482 U.S. 483 (1987)).  This Court has recognized that even where the underlying agreement has a choice-of-law provision, federal law still governs the threshold question of arbitrability. *Olsher Metals Corp. v. Olsher*, Case No. 01-3212-CIV-JORDAN, slip op. at 7 (S.D. Fla. Mar. 25, 2003) (holding that all questions relating to the scope, interpretation and construction

Page 11 of  22

of the arbitration clause would be answered according to federal law despite the presence of a choice-of-law provision calling for the application of the Italian Civil Code). Indeed, counsel for Regent generally conceded that federal law governs the question of arbitrability at the hearing held on December 20, 2006. Accordingly, the question of whether this dispute should be subject to arbitration shall be governed by federal law.

### C. Arbitrability

The provisions in the FAA manifest a "liberal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Group*, 460 U.S. 1, 24 (1983). Furthermore, that federal policy has been recognized to apply "with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). "Notwithstanding this strong federal policy, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Olsher Metals Corp.* at 4 (S.D. Fla. Mar. 25, 2003) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). Therefore, "the parties' intentions control, but those intention are generously construed as to issues of arbitrability." *Mitsubishi Motors*, 473 U.S. at 626. This case presents an unusual circumstance: neither Petitioners, who seek to enforce the arbitration clause, nor Regent, whom Petitioners allege is bound by the arbitration clause, are signatories to the agreement to arbitrate.

The Eleventh Circuit has recognized several circumstances under which nonsignatories to an arbitration agreement are bound to arbitrate. *See MS Dealer v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999). Nonsignatories have been compelled to arbitrate based upon "theories [that] arise out of common law principles or contract and agency law: 1) incorporation by reference; 2)

assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Employers Ins. of Wassau*, 251 F.3d at 1322; *see also Blinco v. Green Tree Servicing LLC,* 400 F.3d 1308, 1312 (11th Cir. 2005) (compelling non-signatory plaintiff to arbitration under equitable estoppel theory) (citing *Price v. Humana Ins. Co.*, 285 F.3d 971, 976 (11th Cir. 2002) (*rev'd on other grounds by Pacificare Health Sys., Inc. v. Book*, 538 U.S. 401 (2003)) ; *Bolamos v. Globe Airport Security Servs., Inc.*, 2002 WL 1839210, *2 (S.D. Fla. May 21, 2002) (finding non-signatory defendant could enforce arbitration provision under agency theory); *Continental Cas. Co. v. American Nat'l Ins. Co.*, 417 F.3d 727, 735 (7th Cir. 2005) (holding non-signatory defendant could enforce arbitration under third-party beneficiary theory).    Likewise, in *Olsher Metals Corp.*, this Court recognized three exceptions that allow nonsignatories to a contract to compel arbitration: (1) equitable estoppel; (2) a sufficiently close relationship between the signatory and nonsignatory defendants; and (3) third-party beneficiary status." *Olsher Metals Corp.* at 11.  Compelling arbitration in this case will turn on whether any of these legal theories provide an exception to the general rule that courts do not compel non-signatories to arbitration.  Petitioners have alleged that this matter should be submitted to arbitration because of (1) equitable estoppel and (2) incorporation by reference.

### 1.    Equitable Estoppel

Petitioners predominantly rely upon the principle of equitable estoppel to compel arbitration. While it is not clear from their filings, Petitioners seem to suggest that equitable estoppel should serve both to permit Petitioners, as nonsignatories, to enforce the arbitration clause, and to compel Regent, as a nonsignatory, to submit to arbitration.  The Court will address these arguments in turn.

### a.    Equitable Estoppel for Petitioners to Compel Arbitration

Equitable estoppel permits a nonsignatory to enforce an arbitration clause in two different

situations.  *Id.*  "First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting [its] claims against the nonsignatory."  *Id.* (quoting *MS Dealer Serv. Corp.* at 947).  When the signatory's claims "make reference to" or "presume the existence of the written agreement, the signatory's claims arise out of and directly relate to the agreement and arbitration is appropriate."  *MS Dealer*, 177 F.3d at 947.  Under the second situation, "'application of equitable estoppel is warranted  . . . when the signatory [to the contract containing the arbitration clause] raises allegations of . . . substantial interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."  *Id.* (internal citations omitted).

Petitioners contend that the first type of equitable estoppel applies because the claims asserted in Regent's Amended Complaint refer to and presume the existence of the Mariner shipbuilding contract.  Petitioners specifically assert that Regent's demand in this action that the Mermaid pod system installed on the Mariner be replaced with a propulsion system that functions properly operates as a concession that Regent is seeking the benefit of the contractual bargain between Radisson and CAT.  Furthermore, in the Amended Complaint, Regent includes allegations that the slewing bearing[8] is defective.  Specifically, Regent states that the slewing bearing was improperly designed, that the Mermaid Consortium failed to test and study the service life and wear characteristics of the slewing bearing and that the slewing bearing's failure led to the drydock of the Mariner.  Amend. Compl. ¶¶ 72, 89, 124-28.  Petitioners contend that the slewing bearing, an element that is inside the hull of the ship, is not a component of the pod, but part of the ship.

---

[8] Although the term is not defined in the Amended Complaint, based on oral argument, apparently the slewing bearing is an element inside the hull from which the pod system hangs, permitting the pod to rotate 360 degrees.

Accordingly, Petitioners suggest that this "cements" the connection to the Mariner shipbuilding contract. Petitioners support this claim by attaching a July 6, 2005 letter from Regent to CAT, wherein Regent asserts that CAT is responsible for the damaged slewing bearing.

Regent, by its own admission, has carefully and intentionally crafted the allegations in its Amended Complaint to avoid setting forth claims that rely upon the terms of the shipbuilding contract. Regent insists that its rights of action "are not founded in any way upon the terms, conditions, rights or responsibilities of the ship building contract." Amend. Compl. ¶ 28. Instead, the crux of Regent's allegations concern (1) misrepresentations by Petitioners that induced Regent into requiring that the Mariner contain the Mermaid pod system, and (2) failures to follow through on promises to repair the pod system after it proved unworkable. Petitioners contend that, despite Regent's assertion to the contrary, Regent must necessarily rely upon the shipbuilding contract in order to prove claims arising before and after delivery of the Mariner. Indeed, this contention seems at first blush to be a reasonable and practical approach. However, based on existing precedent, the Court must reject Petitioners contention. In those cases where courts have permitted nonsignatories to compel arbitration, the claims were explicitly based upon contractual agreements. *See, e.g., McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342 (11th Cir. 1984); (finding that claims were replete with references to the duties of the contract); *Hughes Masonry, Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 841 (7th Cir. 1981) (contractor was equitably estopped from asserting that arbitration clause did not apply, because the very basis of the contractor's claim against the construction manager was that the manager breached the duties and responsibilities assigned it by the owner-contractor agreement). Although, of course, the shipbuilding contract was a necessary precursor to Regent's possession of the

Mariner, Regent has deliberately and adequately limited its claims against Petitioners to those arising outside the bounds of that contract. Unlike the scenarios in *McBro* and *Hughes Masonry*, Regent's claims are not "intimately founded in and intertwined with the underlying contract obligations." *Hughes Masonry*, 659 F.2d at 841, n. 9. Regent has successfully structured its claims to avoid invoking the duties and benefits of the Mariner shipbuilding contract. It is important to note that in doing so, Regent acknowledges that it may be giving up claims that depend upon the existence of the shipbuilding contract.

With respect to the slewing bearing, Petitioners argument fails for several reasons. As Regent noted at oral argument, whether the slewing bearing is more properly thought of as an element of the ship or as part of the pod seems to be a question of fact. To the extent that the slewing bearing is CAT's responsibility, Regent seems willing to absolve CAT of liability by leaving it out of this litigation. If Regent is able to prove that the slewing bearing is part of the pod system, then Petitioners may be responsible, irrespective of the shipbuilding contract. Thus, the inclusion of claims related to the slewing bearing do not necessarily implicate the Mariner shipbuilding contract.

Petitioners also contend that the second theory of equitable estoppel--that Regent has alleged substantial interdependent and concerted misconduct by both Petitioners and CAT--applies in this case. Petitioners support this contention by presenting numerous instances in the *original* complaint suggesting interrelated conduct. Petitioners direct the Court to the July 6, 2005, letter from Regent to CAT as well. Indeed, these documents suggest that, at previous times, Regent sought relief from CAT. The Amended Complaint, however, has been deliberately crafted to avoid this potential basis for compelling arbitration. The Amended Complaint itself does not allege

any substantial and interrelated misconduct between Petitioners and CAT.  While those documents may be suitable to refute Regent's claims at a later stage, at this point the Court must accept as true the claims that Regent has actually alleged.

As a final note, under either theory of equitable estoppel as a basis for allowing a nonsignatory to compel arbitration, the cases seem to require that at least one party be a signatory to the arbitration agreement.  *MS Dealer*, 177 F.3d at 947 ("equitable estoppel applies when the *signatory* to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting [its] claims against the nonsignatory"); ("application of equitable estoppel is warranted . . . when the *signatory* [to the contract containing the arbitration clause] raises allegations of . . . substantial interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract) (emphasis added).  Thus, the equitable estoppel exceptions asserted by Petitioners seem to presume that the claimant is a signatory to the arbitration clause.  Here, however, neither Regent nor Petitioners are signatories to the contract, rendering the exceptions inapplicable.

### b.      Equitable Estoppel Binding Regent to Arbitrate

Petitioners also contend that the principle of equitable estoppel binds Regent to the terms of the arbitration clause.  Equitable estoppel precludes a party from enjoying rights and benefits under a contract while at the same time avoiding its burdens and obligations.  *See Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 838-39 (7th Cir. 1981).  As noted above, Regent specifically crafted its claims in the Amended Complaint to avoid relying on rights arising out of the shipbuilding contract.  It has brought claims for misrepresentations before the agreement was entered into, and allegations that Petitioners breached other subsequent agreements to fix the

problems with the pod systems.  On the other hand, Petitioners stridently assert that the claims are truly based upon the shipbuilding contract, thus requiring arbitration.  Despite Petitioners' insistence that Regent has elevated form over substance by artfully limiting their claims to avoid the shipbuilding contract, the Court finds that Regent, by so circumscribing its claims, does not assert rights based on the contract.  Indeed, the Amended Complaint specifically disclaims such claims and the Court, as it has advised Regent and Radisson, will not permit them to be raised in this litigation.

### 2.    Incorporation By Reference

Petitioners further assert that the arbitration clause in the Mariner shipbuilding contract is applicable against Regent because it was incorporated by reference in the time charter agreement entered into between Regent and Radisson.

A nonsignatory may be bound by an agreement to arbitrate where the arbitration provision is incorporated by reference in an agreement signed by the nonsignatory.  *Thomson-CSF, S .A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995); *see also U.S. Fidelity & Guar. Co. v. West Point Constr. Co., Inc.*, 837 F.2d 1507.  Thus, the essential inquiry here is to establish whether the time charter agreement does in fact incorporate the shipbuilding contract's arbitration clause.  The time charter agreement contains several "annexes," including the Mariner shipbuilding contract.  The time charter states that such "annexes form an integral part of and shall be read and construed with the terms of the [time charter agreement]."  Mariner Time Charter at 20.  Furthermore, the charter agreement states that "[t]he obligation of Charters [Regent] to take the Vessel on hire and accept delivery under this Charterparty is subject only to the condition that the Vessel shall have been accepted by Owners [Radisson] in accordance with the provisions of Article VI of the Building Contract."  Defs. Joint Mot. To Stay, Ex. 1, § 31.04.  Petitioners assert that this language serves to

incorporate the shipbuilding contract's arbitration clause by reference.  Regent, on the other hand, states that the Mariner shipbuilding contract was merely included and referenced to provide context for the arrangement.

Read in the context of the entire time charter agreement, the Court finds that Regent is not bound by the terms of the arbitration clause in the Mariner shipbuilding contract.  First, the time charter agreement contains its own arbitration clause that establishes an entirely different set of rules for arbitration for resolving claims arising from the time charter agreement as distinguishable from those of the shipbuilding contract.  In view of the specific provisions set forth in the time charter agreement, it is clear that the parties, Regent and Radisson, did not intend to bind one another to the distinct arbitration clause in the Mariner shipbuilding contract.  It is unlikely that, after setting up specific rules for arbitration in one agreement, Regent would so casually submit to the arbitration clause in another agreement to which it was not a party by such obtuse means.  This assessment is bolstered by examining the other documents annexed to the time charter agreement, which serve not to impose additional requirements, but rather to provide the necessary context for the time charter agreement to make sense.

Citing *Employers Ins. of Wassau*, Petitioners argue that such specific language of incorporation is not required so long as the language has the effect of incorporating the contract containing the arbitration provision.  In that case, however, the court did not bind the nonsignatory pursuant to incorporation of reference principles, but rather its decision was based on a theory of assumption of the contract.  *See id*. at 1323.  Even accepting the applicability of *Employers Ins. of Wassau*, it is "the parties' intentions [that] control."  *Mitsubishi Motors*, 473 U.S. at 626. Accordingly, something more is required to bind Regent to arbitration in this matter.  In a complex

business arrangement such as that involved here, the Court is reluctant to presume that the parties would submit to the arbitration agreement of a separate contract by merely acknowledging the existence of the shipbuilding contract. Accordingly, incorporation by reference principles do not serve to compel Regent to arbitrate this dispute.

### 3. Other Exceptions

Although Petitioners have made facially appealing and reasonable arguments as to why Regent should be compelled to arbitrate this dispute, Petitioners have failed to present a sound, established legal theory by which they, as non-signatories, should be able to compel arbitration. The equitable estoppel and incorporation by reference theories set forth by Petitioners help to justify why Regent might be bound by the contract, but do not show why Petitioners may compel arbitration. Beyond those exceptions, Petitioners have not asserted that any of the other recognized exceptions apply in this case. It is perhaps worth noting that Petitioners refer to CAT, the signatory to the arbitration contract, as an "Alstom entity." However, Petitioners do not elaborate upon their relationship or how this relationship would be pertinent to the arbitration issue. It seems that Petitioners might be suggesting that they have the right to compel arbitration under some sort of assignment, agency, alter ego or "close relationship" standing, but Petitioners have presented no argument in support of such principles.

Despite the absence of an established exception to the general rule that only signatories be bound to an arbitration agreement, it is worth exploring the specific circumstances of Regent's arrangement further. Although Regent is not a signatory to the shipbuilding contract, it was intimately involved with Radisson and Petitioners at all stages of the agreement. Indeed, it was always Regent's intention to operate the Mariner after it was built. In its Amended Complaint,

Regent asserts that Rolls Royce "specifically targeted and solicited Regent to purchase the Mermaid pod propulsion products and services in Florida." Amend. Compl. ¶ 7. Regent itself initially engaged in negotiations with CAT for Regent's purchase of the Mariner, signing a letter of intent for the building of the cruise ship. *Id.* ¶ 21. However, Regent ultimately decided that it would be more beneficial for tax and financial purposes to commit to a long-term time charter of the Mariner instead of contracting to purchase it outright. *Id.* ¶¶ 25-26. At all times, however, it appears that all parties recognized that Regent would maintain control and operation of the Mariner from the moment of its creation. Thus, it appears that throughout the transaction Regent might be considered the real party in interest with respect to the design and construction of the Mariner. Regent knew of the existence of the arbitration agreement and, through multiple transactions and legal niceties, attempted to avoid arbitration. Because of this, Petitioners suggest, in the alternative, that the Court craft a new theory or extend an existing on which would bind Regent to arbitrate their claims in these circumstances. While Petitioners' request has a certain logical and fairness appeal given the circumstances presented here, the Court declines to do so in the absence of a showing that the parties' expectation was that the specific claims asserted here should be arbitrated. Moreover, the Court is mindful that Petitioners have not presented a single case to the Court whereby one nonsignatory has compelled another nonsignatory to arbitrate claims pursuant to a remote arbitration agreement.

**IV.  Conclusion**

For the foregoing reasons, it is hereby

ORDERED that arbitration of this matter shall not be compelled. Accordingly, with respect to Case No. 06-22539, the Petition Action, the Motion to Compel Arbitration is DENIED. Regent's Motion to Dismiss Petition to Compel Arbitration is GRANTED. Radisson's Motion to Dismiss

Petition to Compel Arbitration is GRANTED.  The Petition to Compel Arbitration is DISMISSED and the Clerk of the Court is directed to mark the case CLOSED.

With respect to Case No. 06-22347, the Removed Action, the Joint Motion to Stay, or in the Alternative, Dismiss the case is DENIED.  Because the Petitioners have indicated their intention to appeal a determination to deny arbitration, the case is STAYED pending the resolution of an appeal in Case No. 06-22539 before the Eleventh Circuit Court of Appeals.

DONE in Chambers, Miami, Florida, February 21, 2007.

Paul C. Huck
United States District Judge

**Copies furnished to**:
Counsel of Record